## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **GREYSTONE COMMUNITY REINVESTMENT ASSOCIATES, INC.** | : CIVIL ACTION NO.: 3:02 CV 1703 (CFD) |
| **V.** | |
| **BEREAN CAPITAL, INC.** | : AUGUST 7, 2007 |

## MOTION FOR LEAVE TO AMEND COMPLAINT

Plaintiff, Greystone Community Reinvestment Associates, Inc. ("Greystone") respectfully requests leave to amend its Amended Complaint pursuant to Federal Rules of Civil Procedure 13(g) and 15(a) in order to include a succor liability claim against Jackson Securities, Inc. ("Jackson Securities") by reason of a merger or consolidation with defendant Berean Capital, Inc. ("Berean") that was uncovered in preparation for trial. While counsel for Berean has not consented to this motion, it is believed that granting this motion will avoid the filing of a misrepresentation lawsuit against Jackson. Additionally, granting this motion will not delay trial of this case as further discovery is unnecessary due to the admission by Berean that it has "**merged most of Berean Capital into Jackson Securities**" stripping Berean of assets and reducing it to a "**BD [Broker/Dealer] with limited activities**".

Plaintiff respectfully requests that this Court grant the Motion for the foregoing reasons, in addition to those set forth in the attached Memorandum of Law in Support of Motion for Leave to Amend Complaint (attached).

PLAINTIFF,
GREYSTONE COMMUNITY
REINVESTMENT ASSOCIATES, INC.

By: _____

Eliot B. Gersten (ct05321)
John J. Robacynski (ct15636)
Gersten Clifford & Rome, LLP
214 Main Street
Hartford, CT 06106
Tel: (860) 527-7044
Its Attorneys

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **GREYSTONE COMMUNITY REINVESTMENT ASSOCIATES, INC.** | : CIVIL ACTION NO.: 3:02 CV 1703 (CFD)<br>:<br>:<br>: |
| **V.** | :<br>: |
| **BEREAN CAPITAL, INC. and JACKSON SECURITIES LLC** | :<br>: AUGUST 7, 2007 |

## SECOND AMENDED COMPLAINT

Plaintiff files this Amended Complaint as the result of a merger/consolidation of defendant, Berean Capital, Inc. with Jackson Securities LLC.

### JURISDICTION

1.      This Court has jurisdiction over the claims asserted herein based upon 28 U.S.C. §1332, in that the action is one involving parties with complete diversity of citizenship and the amount in controversy is in excess of $75,000.00.

### PARTIES

2.      The Plaintiff, Greystone Community Reinvestment Associates, Inc., is a Connecticut corporation with a principal place of business at 750 Main Street, Hartford, Connecticut.

3.      The Defendant Berean Capital, Inc. is a brokerage firm with an address of 300 S. Wacker Drive, Chicago, Illinois. Berean Capital, Inc. owned primarily by Dudley Brown ("Dudley Brown"). Between 1990 and 1992, Berean Capital, Inc. was registered with the Connecticut Department of Banking to conduct business in Connecticut. Berean Capital, Inc. again applied to be registered in Connecticut in 2002 and was granted approval in 2003. In 1995, Berean Capital Inc.

was merged/consolidated with Defendant, Jackson Securities LLC, a brokerage firm with an address of 100 Peachtree Street, Suite 2250 Atlanta, GA. Jackson Securities LLC is the successor in interest by merger/consolidation of Berean Capital, Inc with Jackson Securities LLC. The combined firm retained the name Jackson Securities LLC. Both Jackson Securities LLC, and Berean Capital, Inc. are owned, operated and/or controlled primarily by Dudley Brown, an officer in both corporations (Berean Capital, Inc. and Jackson Securities LLC hereinafter collectively referred to as "Berean" or "Defendant").

## FACTUAL ALLEGATIONS

4.      In 1995, Howard Brown, President of Greystone and former Banking Commissioner for the State of Connecticut (hereinafter "Brown"), developed a unique idea to market inner city, single-family, affordable housing mortgages which qualified as CRA loans, as a pool of mortgages to be professionally managed and securitized (hereinafter the "CRA Securitization"). Brown's idea was to realize benefits from the unrecognized value in CRA mortgages and to assist regulated depository institutions in complying with the Community Reinvestment Act of 1977 ("CRA"), 12 U.S.C. 2901, *et. seq*. To enhance the marketability of his idea, Greystone needed pre-qualification from federal bank regulators before proposing the CRA Securitization to investors.

5.      Greystone's idea for a CRA Securitization provided increased liquidity and benefit to the low to moderate income mortgage market by creating a valuable and more freely-traded CRA commodity.

6.      At all relevant times herein after February 1996, Daniel Homick (hereinafter "Homick") and David Irving (hereinafter "Irving") were either employed by, officers of, and/or registered representatives of Berean.

7.      As further set forth herein, acting in the trade and commerce of the state of Connecticut, Homick and Irving traveled to Hartford, Connecticut on behalf of Berean on February 6 through February 8, 1996 to meet with Brown in order to discuss "new business" for Berean in New England. Dudley Brown delegated responsibility to Homick and Irving for Berean's new business with Greystone. At this meeting, Brown briefed Homick and Irving on Greystone's planned CRA Securitizations in Massachusetts and Connecticut. Berean indicated great interest in this new business opportunity and agreed to keep Greystone's information confidential.

8.      Greystone convinced one of its shareholders, Phoenix Home Life, that a team was needed to make the CRA Securitization succeed. Brown contacted Homick for suggestions on the team's makeup. Homick, as a registered representative of Berean, suggested to Brown that Berean be included as part of the team because of its particular expertise and knowledge in making introductions, organizing teams, brokering deals and setting up transactions.

9.      On March 12, 1996, Homick again traveled to Hartford on behalf of Berean to meet with Brown and a representative of United Guaranty Inc. and to further discuss Greystone's CRA Securitization. Homick again traveled to Connecticut on behalf of Berean on March 20 through March 23, 1996 to again meet with Brown on this potential "new business" in Massachusetts and Connecticut.

10.      In April, 1996, Greystone retained Lane & Mittendorf, LLP of Washington, D.C. to obtain an opinion from the U.S. Comptroller of the Currency (hereinafter "OCC" approving or giving favorable consideration to Greystone's CRA Securitization, which Greystone intended to package, market and sell in Massachusetts and then Connecticut.

11.     In the early summer of 1996, Greystone requested that Berean be part of the team for the Massachusetts and Connecticut business transaction and to act for Greystone as its agent in locating a mortgage pipeline bank with access to the capital markets in relation to Greystone's CRA Securitization.  Berean accepted the undertaking and agreed to protect Greystone's unique idea and related confidential information and to allow Greystone control over the project.  Berean agreed to find a venture partner for Greystone to develop, package, market and sell a CRA Securitization in Massachusetts and Connecticut.  Greystone relied on Berean to fully protect Greystone's interests. The parties further agreed that Berean would approach First Union as a possible team member and venture partner.

12.     In July, 1996, Berean, as agent for Greystone, acted as a middleman and approached First Union to determine First Union's interest in participating with Berean in a venture with Greystone.  First Union agreed and Berean set up a meeting to introduce Greystone.  Neither Greystone nor Berean disclosed any of the details of Greystone's unique idea for a CRA Securitization before negotiating a confidentiality agreement to protect Greystone's CRA Securitization concept and other proprietary and confidential information.  Because Greystone was not mentioned in the draft agreement provided by Berean, Brown suggested that the confidentiality agreement either reference Greystone or a separate confidentiality agreement be used for Greystone. Homick and Irving, on behalf of Berean, told Brown that Greystone and its confidential information were fully protected with the one agreement and that Greystone need not be mentioned because the intent was to protect Greystone as Berean's client.  Berean was in a superior position because it failed to disclose to Greystone that the confidentiality agreement also was intended to further Berean's interests of presenting paying clients to First Union.

˅4˅

13.     In July and August of 1996, Berean negotiated the terms of a confidentiality agreement with First Union purportedly to protect Greystone's unique CRA Securitization idea, in addition to its concepts, strategies and developments including, but not limited to, the value associated with CRA mortgages. Prior to finalization, Berean convinced Greystone that only one confidentiality agreement with First Union was needed to protect Greystone and its unique idea and confidential information.   Berean further convinced Greystone that Greystone need not be specifically mentioned in the agreement, but simply referred to as Berean's "client." Greystone relied on, to its detriment, that it was Berean's "client" and that Greystone's unique idea and confidential information were fully protected by the confidentiality agreement.   Greystone was the third party beneficiary of this confidentiality agreement.

14.     By letter dated August 21, 1996, Irving, as Vice President of Berean, wrote to First Union that "we need to get the confidentiality agreement signed, allowing us to establish dialogue between Greystone/Phoenix Home Life and First Union" and "a contractual relationship between our three firms" as it related to the Massachusetts and Connecticut CRA Securitizations. Berean also used this letter as a vehicle to further its interests with other clients.  Berean was in a superior position in that it never disclosed to Greystone that the confidentiality agreement was to be used to protect Berean in introducing "paying" clients.  Indeed, Berean represented to Greystone that the confidentiality agreement was solely to protect Greystone and its confidential information while preventing circumvention around Berean.  Berean also represented to Greystone that Greystone's name could not be referenced because others had gone around Berean's back in the past to get to Berean's client. Greystone knew that Berean hoped to cultivate First Union's interest in other Berean clients, however, it was not disclosed to Greystone nor was Greystone aware that Greystone was not

considered to be a "client" or that Berean would attempt to bring only "paying" clients under the terms of Greystone's confidentiality agreement.

15.     Between February and September 1996, Homick made several trips to Connecticut with Irving on behalf of Berean to work on their "new business". During this period, Homick and Irving made numerous telephone calls and sent many facsimile transmissions on behalf of Berean to Greystone in Connecticut relating to the CRA Securitization venture. Likewise, a similar number of calls and facsimile transmissions were made by Brown to Homick and Irving on the same subject. Indeed, Dudley Brown, as the principal behind Berean, had several telephone conversations with Brown and traveled twice to meet with Brown in Connecticut on the CRA Securitization venture.

16.     On September 1, 1996, Homick agreed with Greystone that for purposes of securities regulation, and to the extent necessary to be in compliance with all applicable state and federal securities laws regarding the registration of registered representatives of brokers and dealers, he will remain "a registered representative of Berean."

17.     On or about September 19, 1996, and in furtherance of Homick's discussions with Brown and Irving's August 21, 1996 letter, a written confidentiality agreement was entered into and a special relationship was created among Berean, individually and as agent for Greystone, and First Union whereby the parties agreed to keep Greystone's CRA Securitization information in trust and strictly confidential and to protect Greystone's unique idea and confidential information from use or disclosure (hereinafter "Confidentiality Agreement"). Irving signed the agreement as Vice President of Berean and provided Greystone with a copy. Berean, however, never advised Greystone that it told First Union that it was really a noncircumvention agreement intended to protect Berean and its paying clients.

18.     Unbeknownst to Greystone, Berean negotiated changes to the confidentiality agreement motivated only by the need to protect Berean and its self interests. Berean was in a superior position in that it never disclosed to Greystone that only "paying" clients would be presented by Berean to First Union under Greystone's Confidentiality Agreement.

19.     In the weeks around the execution of the Confidentiality Agreement, Homick traveled to Hartford on behalf of Berean to meet with Brown three times in furtherance of their CRA Securitization venture. Homick expensed these trips as "new business" for Berean.

20.     In or around early October, 1996, Greystone and representatives from Berean met with First Union. Greystone disclosed the details of the CRA Securitization and the specific issues contained in the then-pending application for an OCC opinion based on Berean's representations that it was subject to the terms of the agreement with First Union. First Union followed up by providing Greystone and Berean with an outline of responsibilities for the "related parties" to the Confidentiality Agreement and CRA Securitization venture. In it, Berean was designated to "[c]o-ordinate parties/activities related to the transaction" and to "[a]ssist Greystone in the pre sale effort." Indeed, Berean took no exception to First Union's description of the transaction and, instead, Dudley Brown wrote to Greystone on October 18, 1996, "[a]s a follow up and supplement to First Union's Outline of Responsibilities".

21.     Between December 4 and 5, 1996, Homick, on behalf of Berean, traveled to Connecticut to meet with Brown and the Connecticut Bankers Association to solicit interest in the CRA Securitization venture in Connecticut.

22.     On December 23, 1996, Greystone obtained a favorable OCC opinion for the CRA Securitization and provided a copy to Berean and First Union. In addition to the pre-qualification of

˅7˅

favorable CRA consideration, the OCC Opinion increased the value of Greystone's unique idea by broadening the geography of CRA compliance beyond the statistical marketing area of a bank's offices. On December 27, 1996, Irving wrote to Greystone on behalf of Berean, copying Dudley Brown, giving "[c]ongratulations on finally receiving a favorable opinion from the Comptroller of the Currency".

23.     At about the same time, Greystone's continuing research developed significant confidential information about delinquencies and average life of loans which made the CRA Securitization easier to market and more valuable to investors. The results of Greystone's work and research made the CRA securitization economically feasible and valuable. These values were disclosed by Greystone to Berean and First Union pursuant to what Greystone believed to be the Confidentiality Agreement with First Union that would protect such disclosures. Between December, 1996 and September, 1997, Greystone freely provided its proprietary research, development and ideas to Berean and Berean freely disclosed and discussed such information with First Union.

24.     By facsimile dated February 2, 1997 to Brown in Connecticut, copying Dudley Brown, Homick advised that "[a]s a registered rep. of Berean, I can sell/contact potential investors on your behalf only if Greystone and Berean enter into an Agreement."

25.     Over the three-day period beginning February 18, 1997, Homick, on behalf of Berean, met with Brown in Connecticut to help finalize the Greystone CRA Securitization and to prepare presentations for Massachusetts and Connecticut banking associations.

26.     By facsimile transmission from Greystone's Connecticut offices to First Union on February 26, 1997, Homick writes: "as you can see, I'm back in Hartford with Greystone. Yesterday I reviewed the second draft of the offering circular."

27.     Between February and March, 1997, Greystone disclosed additional confidential and proprietary information to Berean, who then disclosed this information to First Union. Homick eventually traveled to Connecticut on behalf of Berean and met with Greystone and the Phoenix and to make a presentation to the Connecticut Bankers Association.

28.     In and about the February, 1997 -- March, 1997 time frame, and unbeknownst to Greystone, First Union contacted Bear Stearns & Co. (hereinafter "Bear Stearns") to look at First Union's CRA portfolio and come up with ideas on what First Union could do with its extensive portfolio of CRA mortgages. After some research and study which, included Greystone's recently issued December, 1996 OCC opinion, Bear Stearns developed several ideas including a CRA Securitization. Bear Stearns disclosed these ideas to First Union and First Union elected to pursue a CRA Securitization with Bear Stearns. Because First Union had a confidentiality agreement with Berean and not directly with Greystone, First Union failed to disclose the existence of the confidentiality agreement to the employees and attorneys assigned to the Greystone CRA securitization, and assigned many of the same employees and attorneys to work on both the Greystone CRA securitization and the undisclosed CRA securitization with Bear Stearns. Indeed, First Union began to freely exchange Greystone's confidential and proprietary information with Bear Stearns, including information regarding longer average life, lower than expected default rates and prepayment histories. Had Greystone known that Berean breached the Confidentiality Agreement by

failing to protect Greystone's confidential and proprietary CRA securitization concept from use, disclosure and exploitation by First Union, Greystone would never have disclosed this information.

29.    By letter dated March 17, 1997, Greystone expressed concern to both Berean and First Union that Greystone's CRA Securitization venture may be "scooped" by competitors who may try to take advantage of the OCC Opinion and use, build upon or replicate Greystone's efforts. At no time did Berean advise Greystone that Greystone's proprietary ideas and information were not protected.

30.    After making repeated disclosures to Berean and First Union pursuant to their Confidentiality Agreement, the parties agreed upon a structure for the CRA Securitization and finalized the documentation in an offering circular ("Offering Circular"). More specifically, the Offering Circular for the securities to be issued by Greystone from Connecticut identifies Berean as the "Placement Agent". In furtherance thereof, Greystone sent to Berean a proposed written agreement dated June 6, 1997 to act as Placement Agent. Berean signed and returned the fully-executed Placement Agent Agreement to Greystone in Connecticut. On or around July 1, 1997, the CRA Securitization Offering Circular was finalized and Berean designated as the Placement Agent. Both Greystone and Berean were identified on the cover of the offering circular as points of contact.

31.    In accordance with the parties' agreements, Irving, as vice president and registered representative of Berean, wrote on July 10, 1997 to Greystone that "it will not distribute any copies of the Offering Circular to any banks, savings banks, savings and loan associations and other similar institutions, or any other prospective investors, until it has received express authorization to distribute such copies of the Offering Circular from Howard B. Brown, President of Greystone".

32.    On September 8, 1997, Greystone and Berean issued a joint press release on the

˘10˘

CRA Securitization indicating that "[t]he product will be marketed initially to Massachusetts and Connecticut Banks" and Greystone gave Berean the requested authorization.

33.    In October, 1997, First Union publicly offered a competing CRA Securitization with Bear Stearns.   The final First Union/Bear Stearns securitization was based upon Greystone's confidential and proprietary information and based on the unique idea of Greystone and Brown to securitize a mortgage pool consisting primarily of affordable housing mortgages from statewide or regional statistical marketing areas. Following disclosure of this competing CRA Securitization with Bear Stearns, Berean continued to solicit First Union on behalf of paying clients under Greystone's Confidentiality Agreement without disclosing this to Greystone.  At the same time, Berean advised Greystone to pursue its CRA Securitization elsewhere.

34.    Following the First Union/Bear Stearns securitization, Greystone filed suit against First Union.  During the course of this litigation, Berean, thereafter, purportedly assisted Greystone with the prosecution of its case.

35.    In January, 2001, Berean agreed to have Irving travel to Hartford, Connecticut and voluntarily testify on behalf of Berean Capital, Inc. pursuant to First Union's counsel's letter and Notice of Deposition dated January 25, 2001.  Indeed, Dudley Brown forwarded this letter and Notice of Deposition to Irving for compliance.  Berean further agreed to attend the deposition without issuance of a subpoena in order to be examined and to produce all documents relating to Greystone's CRA Securitization. Berean agreed that it would specifically identify any document that was lost or destroyed.  Pursuant to this letter and Notice of Deposition, Berean arranged for Irving to travel to Hartford, Connecticut.  Berean also voluntarily forwarded its files to Connecticut for use in the deposition.  Berean also wrote that "[i]f we are able to locate additional documentation we will

forward that also." On February 13, 2001, Irving was deposed as Berean's duly authorized representative. On February 12, 2001, Homick also traveled to Hartford, Connecticut and was voluntarily deposed. Berean failed, however, to produce or identify Irving's August 21, 1996 letter as was required by the Notice of Deposition. Berean hid this letter or otherwise failed to produce or disclose it because it would expose Berean's wrongdoing. This letter was material to the advancement of Greystone's case against First Union because it identified the Confidentiality Agreement as the "contractual relationship between our three firms," namely, Greystone, First Union and Berean. Greystone discovered that Berean failed to produce this letter in February, 2003.

36.     By letter dated June 14, 2001 to Greystone's Connecticut counsel, Dudley Brown requested the following documents be returned: "Original Berean Capital phone records provided directly to you by me . . . All records, correspondence and any other documents provided to you or your client Howard Brown, by my former employee and currently registered representative, Dan Homick."

37.     In about December, 2001, Greystone and First Union were on the verge of settling their litigation and Berean was contacted for a general release in order for the settlement to proceed for Greystone.

38.     Berean failed to furnish a release and, instead, reacted by filing a National Association of Securities Dealers arbitration against First Union in about January, 2002 relating the CRA Securitization (hereinafter "NASD Arbitration") without Greystone's authorization.

39.     By letter dated February 22, 2002, Greystone warned Berean that the settlement discussions with First Union had been suspended as a result of Berean's NASD Arbitration and inappropriate interference. Greystone, as Berean's principal, advised Berean that Berean had no

authority to pursue the arbitration against First Union.   Greystone further demanded Berean's compliance.

40.     By letter dated April 23, 2002, Greystone further advised Berean that its arbitration proceeding was contrary to Greystone's interests as principal and presented an unacceptable risk to Greystone in its lawsuit against First Union.

41.     On or about February 20, 2003, the NASD arbitration made an Award that denied Berean's claims in their entirety.

42.     Subsequently, Dudley Brown, President of Berean represented that Berean's joining forces with Jackson Securities was not material to affect the Berean's status in this litigation. This representation was false and was intended to mislead and deceive Greystone.  Indeed, Dudley Brown represented to the world that the two firms have merged/consolidated but has wrongfully denied such merger/consolidation to Greystone.

## COUNT ONE [Breach of Confidentiality]

43.     Berean breached the Confidentiality Agreement by failing to protect Greystone and Greystone's confidential and proprietary information relating to the CRA Securitization from use or disclosure by First Union.

44.     Berean breached the Confidentiality Agreement by using and disclosing Greystone's confidential information in the NASD Arbitration without restriction.

45.     Berean breached the Confidentiality Agreement by using and disclosing Greystone's confidential information in the NASD Arbitration without Greystone's consent and by compromising Greystone's action against First Union with an unfavorable Award.

46.     As a result of the above breaches, Greystone has been damaged and continues to be damaged.

**COUNT TWO [Breach of Agency Agreement and Placement Agent Agreement]**

1.- 45.  Plaintiff repeats and re-alleges paragraphs 1 through 45 of Count One as if fully set forth herein.

46.     Berean breached its agency agreement and Placement Agent Agreement with Greystone, as set forth above, and by failing to produce the August 21, 1996 letter from Irving to First Union in response to First Union's subpoena or subsequently.

47.     Berean breached its agency agreement and Placement Agent Agreement with Greystone by failing to provide the necessary release to settle Greystone's litigation against First Union.

48.     Berean breached its agency agreement and Placement Agent Agreement by putting Berean's interests first and foremost over that of Greystone, Berean's principal.

49.     Berean breached its agency agreement and the Placement Agent Agreement by filing the NASD Arbitration against First Union without receiving Greystone's, its principal's, consent and by making claims averse to the interests of Greystone.

50.     As a result of the above breaches, Greystone has been damaged and continues to be damaged.

**COUNT THREE [Breach of Fiduciary Duty]**

1.- 49.  Plaintiff repeats and re-alleges paragraphs 1 through 49 of Count Two as if fully set forth herein.

50.    A special relationship and position of trust were established when Berean agreed to act as Greystone's agent, placement agent and to protect and keep Greystone's unique idea and confidential information confidential and to put Greystone's interests first and foremost. This special relationship and position of trust were a fiduciary relationship and were memorialized in the Confidentiality Agreement and the Placement Agent Agreement.

51.    As set forth above, Berean was under a duty to represent the interests of Greystone and Greystone relied to its detriment on the promises, representations and assurances of Berean.

52.    Berean breached its fiduciary duty to Greystone, as set forth above, and by failing to protect Greystone's unique idea and confidential information.

53.    Berean breached its fiduciary duty to Greystone by failing to produce the August 21, 1996 letter from Irving to First Union in response to First Union's subpoena or subsequently.

54.    Berean breached its fiduciary duty and duty of loyalty to Greystone by failing to provide the necessary release to settle Greystone's litigation against First Union.

55.    Berean breached its fiduciary duty and duty of loyalty to Greystone by putting Berean's interests first and foremost over that of Greystone.

56.    Berean breached its fiduciary duty and duty of loyalty to Greystone by filing the NASD Arbitration against First Union without receiving its principal's consent.

57.    Berean breached its fiduciary duty to Greystone by taking a position in the NASD Arbitration that was averse to the interests of Greystone. Berean further breached its fiduciary duty to Greystone by pursuing the NASD Arbitration claim to an unfavorable Award and by misrepresenting the materiality of joining forces with Jackson Securities.

58.    As a result of the above breaches, Greystone has been damaged and continues to be damaged.


## COUNT FOUR [Fraud]

1.- 57.  Plaintiff repeats and re-alleges paragraphs 1 through 57 of Count Three as if fully set forth herein.

58.    As set forth above, Berean made false representations to Greystone about the Confidentiality Agreement.

59.    Berean knew that its representations to Greystone about the Confidentiality Agreement were false in that it was intended by Berean to protect Berean from circumvention and that Berean had paying clients it intended to introduce pursuant to Greystone's Confidentiality Agreement.  Berean intentionally withheld from Greystone the solicitation of First Union on behalf of paying clients under Greystone's Confidentiality Agreement and that Berean did not consider Greystone to be a client because it was not paying Berean for its services.  This was hidden from Greystone by Berean until March, 2003.  Berean further falsely represented the materiality of joining forces with Jackson Securities.  Berean knew this representation was false and intended to harm and prejudice Greystone by this representation

60.    Berean also knew that it was under a legal obligation and duty to produce or identify as lost or destroyed Irving's August 21, 1996 letter pursuant to First Union's Notice of Deposition.  Berean intentionally withheld the letter and failed to identify it as destroyed or missing.

˘16˘

61.    The false representations and nondisclosures by Berean were made to induce Greystone to pursue the CRA Securitization with Berean and to hide the extent of Berean's self dealing and other client interests.

62.    As set forth above, Greystone acted on Berean's false representations and nondisclosures to its injury.

63.    As a result of Berean's false representations and nondisclosures, Greystone has been damaged and continues to be damaged.

### COUNT FIVE [Fraudulent Concealment]

1.- 62.  Plaintiff repeats and re-alleges paragraphs 1 through 62 of Count Four as if fully set forth herein.

63.    Berean was aware that it was self dealing in relation to the negotiation of the Confidentiality Agreement for Greystone.  Berean was aware that it characterized the Confidentiality Agreement as a noncircumvention agreement to First Union.  Berean also knew that it was intended, and did introduce, other clients to First Union pursuant to the Confidentiality Agreement that it told Greystone was intended solely for Greystone and Greystone's benefit.  Berean also knew that Irving's August 21, 1996 letter disclosed Berean's self dealing and it's other client.

64.    Berean affirmatively acted on its self dealing and introduced another client to First Union pursuant to Greystone's Confidentiality Agreement.

65.    Berean intentionally concealed these facts from Greystone, even to the extent that it failed to produce Irving's August 21, 1996 letter pursuant to First Union's Notice of Deposition.  Berean further intentionally concealed the materiality of its joining forces with Jackson Securities and the fact of its merger/consolidation.

˘17˘

66.     Berean concealed these facts, and the August 21, 1996 letter, from Greystone to hide its self dealing and side deal with First Union, and its false representations and inducements to Greystone.

67.     As a result of the above, Greystone has been damaged and continues to be damaged.

## COUNT SIX [Intentional Interference]

1.- 66.  Plaintiff repeats and re-alleges paragraphs 1 through 66 of Count Five as if fully set forth herein.

67.     Greystone had a business relationship with First Union, and a reasonable expectation in a continuing business relationship and settlement of its differences with First Union, of which Berean was aware.

68.     Berean, by engaging in, and continuing to engage in, the conduct and activities described above, has intentionally and tortuously interfered with Greystone's business expectations and settlement with First Union.

69.     Greystone, as a result of Berean's wrongful acts, has suffered and continues to suffer from the loss of business and settlement with First Union, loss of revenue and future business relations.

70.     By failing to provide a release, by filing the NASD Arbitration, by taking a position adverse to its principal, by failing to produce Irving's August 21, 1996 letter, and, as set forth above, Berean has acted and continues to act to the present and future damage and injury and damage to Greystone.

## COUNT SEVEN [Civil Theft]

1.- 70.  Plaintiff repeats and re-alleges paragraphs 1 through 70 of Count Six as if fully set forth herein.

71.     Berean knew that it was not the developer and owner of the unique CRA Securitization idea and the related confidential information.  Berean knew that Greystone was the developer and owner.

72.     By pursuing the NASD Arbitration, and the claims set forth therein, Berean engaged in civil theft and stole the property of Greystone.

73.     As a result of the above, Greystone has been damaged.

## COUNT EIGHT [Unfair Trade Practices]

1.- 72.  Plaintiff repeats and re-alleges paragraphs 1 through 72 of Count Seven as if fully set forth herein.

73.     Berean's acts and conduct, as described herein, constitute one or more acts of "trade" or "commerce" as defined in C.G.S. Sec. 42-110a.  Such acts and conduct have caused Greystone ascertainable losses of money, property and business opportunities.

74.    Berean, by engaging and continuing to engage in the conduct and activities described above, including failing to produce Irving's August 21, 1996 letter, despite the legal obligations and agreement, while using the letter to pursue its own self interests in the NASD Arbitration; pursuing the NASD Arbitration without Greystone's consent; stealing Greystone's unique idea and confidential information for purposes of the NASD Arbitration; disclosing Greystone's unique idea and confidential information in the NASD Arbitration without restriction and without Greystone's consent; and misrepresenting Berean's merger with Jackson Securities, has offended and continues to offend the public policy as established by statutes and the common law.  As described above, Berean has engaged in, and continues to engage in, immoral, unethical, illegal, oppressive and unscrupulous conduct, all of which constitute an unfair method of competition and unfair and/or deceptive acts and/or practices in violation of the Connecticut Unfair Trade Practices Act, C.G.S. Sec. 42-110a through 42-110q, inclusive.

75.    By the acts and practices set forth herein, Berean has acted and continues to act to the present and future damage and injury of Greystone.

## PRAYER FOR RELIEF

WHEREFORE, Greystone claims:

(a)    compensatory damages;

(b)    punitive damages;

(c)    double damages pursuant to C.G.S. Sec. 42-110g;

(d)    treble damages pursuant to C.G.S. Sec. 52-564;

(d)     attorney's fees and other costs incurred in preparation and prosecution of these legal

proceedings;

(e)     judgment against Jackson Securities LLC as successor by merger/consolidation with

Berean Capital, Inc.; and

(f)     such other and further relief as the court may deem just and equitable.


PLAINTIFF,
GREYSTONE COMMUNITY
REINVESTMENT ASSOCIATES, INC.


By:       _____

Eliot B. Gersten (ct05321)
John J. Robacynski (ct15636)
Gersten Clifford & Rome, LLP
214 Main Street
Hartford, CT 06106
Tel: (860) 527-7044
Its Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2007, a copy of the foregoing was filed electronically and served by first class mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Thomas J. Finn, Esq.
McCarter & English LLP
CityPlace I
185 Asylum Street
Hartford, CT 06103

PLAINTIFF,
GREYSTONE COMMUNITY
REINVESTMENT ASSOCIATES, INC.

By: _____
Eliot B. Gersten (ct05321)
John J. Robaczynski (ct15636)
Gersten Clifford & Rome, LLP
214 Main Street
Hartford, CT 06106
Tel: (860) 527-7044
Its Attorneys