## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GREYSTONE COMMUNITY | : | |
| REINVESTMENT ASSOCIATION, INC., | : | |
|     plaintiff | : | |
| | : | |
|           v. | : | 3:02-cv-1703 (CFD) |
| | : | |
| BEREAN CAPITAL, INC. AND | : | |
| JACKSON SECURITIES, INC., | : | |
|     defendants | : | |

## RULING ON MOTIONS FOR SUMMARY JUDGMENT

This case was initially brought by the plaintiff Greystone Community Reinvestment

Associates, Inc. ("Greystone") against defendant Berean Capital, Inc. ("Berean").  Greystone

alleged breaches of confidentiality, contract, and fiduciary obligation by Berean, as well as tort

and CUTPA violations.  Greystone subsequently amended its complaint to allege that Jackson

Securities, LLC ("Jackson" or "Jackson Securities") should be liable as a successor to Berean

after the 2005 sale of substantially all of Berean's assets to Jackson in an alleged merger/

consolidation, and to include factual allegations arising out of Berean's failure to disclose the

material effect of the alleged merger on the instant litigation.  Both Greystone and Jackson have

filed motions for summary judgment on the issue of successor liability.  Jackson has moved, in

the alternative, for severance of the successor liability issue into a separate trial.  For the

following reasons, the Court finds that Illinois law applies to the successor liability issue and that

genuine issues of material fact remain as to the liability of Jackson as successor to Berean.  The

motions for summary judgment are denied, and the motion for severance is also denied.

-1-

I.       **Background**[1]

This case was initially filed in the Connecticut Superior Court by the plaintiff Greystone against defendant Berean and was removed to federal court on August 23, 2002.  Greystone's initial claims against Berean arose out of (1) Berean's alleged breach of a confidentiality agreement regarding Greystone's idea for a "CRA Securitization" investment product, (2) Berean's interference with Greystone's settlement agreement with First Union National Bank of North Carolina ("First Union") during litigation resulting from First Union's use of Greystone confidential information (received from Berean) to market a competing CRA Securitization product with Bear Stearns & Co., and (3) Berean's pursuit of its own arbitration proceeding against First Union.  Greystone alleged breach of contract, breach of fiduciary duty, fraud, fraudulent concealment, intentional interference with business expectations, civil theft, and CUTPA violations against Berean.

A.       **The 2005 Transaction**

In May 2005, while this action was still pending, Jackson Financial Corporation ("JFC"), the sole member of Jackson Securities[2] as well as of two related entities, Jackson Financial Products, LLC ("JFP") and Jackson Management Services, LLC ("JMS"), Dudley Brown (the owner of 100% of Berean's capital stock) and Berean entered into a Transaction and Contribution Agreement ("Transaction Agreement" or "Trans. Agr.").  On June 1, 2005, Jackson Securities and Dudley Brown also entered into an Amended and Restated Operating Agreement

---

[1]The facts related herein are taken from the parties' briefs, affidavits, depositions, and Rule 56(a) statements of fact and are undisputed unless otherwise noted.

[2]Jackson Securities is a Georgia limited liability company whose single member was JFC until the 2005 transaction.

("Operating Agreement" or "Op. Agr.") for Jackson Securities.  Through these two contracts,

1.      Berean contributed "substantially all" of its operating assets and leases, including

        furniture, furnishings, and office equipment for all of its locations,[3] to Jackson Securities

        (Transaction Agreement Section 2.3);

2.      Jackson Securities extended employment offers to each of Berean's former employees

        (Trans. Agr. § 2.9);

3.      Jackson assumed liability only for Berean's "current liabilities arising out of the operation

        of Berean in the regular and ordinary course of business in an amount not to exceed

        $75,000" (Trans. Agr. § 2.5);[4]

4.      JFC contributed 100% of the membership interests of JFP and JMS, to become wholly-

        owned subsidiaries of Jackson Securities (Trans. Agr. § 2.6);

5.      Dudley Brown contributed $250,000 to Jackson Securities (Trans. Agr. § 2.2) and

---

        [3]The Jackson press release indicates that Berean's offices were located in Chicago, St.
Louis, Dallas, Atlanta and Milwaukee.  "Schedule 2.3" to the Transaction Agreement lists office
space leases at Chicago, Dallas, Richardson (TX), Houston, and Milwaukee.  Jackson admits that
it has offices in Atlanta, Chicago, Houston, Dallas, Los Angeles, Miami, Milwaukee, Oakland,
St. Louis and Stamford, Connecticut.

        [4]"Current liabilities" is an accounting term of art which means short-term debts due in
less than one year.  Current liabilities are what a company currently owes to its suppliers and
creditors, for example "accounts payable," "accrued expenses," (e.g. marketing and distribution
expenses that are billed on a set schedule and have not yet come due), income tax payable, short-
term notes payable, and the portion of long-term debt that may come due in a given year.  See,
e.g., The Motley Fool, "How to Read a Balance Sheet: Current Liabilities" (Aug. 21, 2008),
http://www.fool.com/investing/beginning/how-to-read-a-balance-sheet-current-liabilities.aspx.

extended to Jackson Securities a loan of $80,000 (Trans. Agr. § 2.8);

6.      Dudley Brown (100% owner of Berean) and Reuben R. McDaniel, III (45% owner of

        JFC[5]) entered into employment agreements to work as Co-Chairman/CEO and Co-

        Chairman/President, respectively, of Jackson Securities (Op. Agr. § 5.7); and

7.      Dudley Brown acquired 50% of the ownership share in Jackson Securities (Op. Agr. at 1

        and Op. Agr. Exh. A).

#### B.      Other Provisions in the 2005 Transaction and Operating Contracts

The Transaction Agreement states that "Brown and [Jackson Financial Corporation]

desire to combine Brown's investment banking business experience with [Jackson Securities']

investment banking business and for Brown and [Jackson Financial Corporation] to own

[Jackson Securities] on a 50/50 basis."  Trans. Agr. at 1.  Exhibit A to the Operating Agreement

lists the post-merger members of Jackson Securities and their membership shares: Brown with

50%, and Jackson Financial Corporation with 50%.

The Transaction Agreement contains a choice of law provision which provides that "This

Agreement shall be governed by and construed in accordance with the internal substantive laws

of the State of Illinois, without giving effect to conflict of laws rules."  Trans. Agr. § 10.8.  The

Operating Agreement contains a choice of law provision which provides that the laws of Georgia

apply.  Op. Agr. § 14.2.

The Transaction Agreement also contained indemnification provisions by which each of

---

[5]The remainder of JFC is 43% owned by the estate of Maynard Jackson and 12% by
certain of Jackson's employees.  Trans. Agr. § 6.4.

the three parties (Brown, Berean, and JFC) indemnified Jackson Securities against damages

arising from

> (a) any inaccuracy in or breach of any of the representations or warranties made by [Brown/Berean/JFC] in this Agreement; (b) any inaccuracy or misrepresentation in a certificate or affidavit delivered by [Brown/Berean/JFC] at the Closing in accordance with the provisions of this Agreement; (c) any breach by [Brown/Berean/JFC] of the covenant, agreement or obligation of [Brown/Berean/JFC] contained in this Agreement; and [(d), as to Brown; (e) as to Berean and JFC] all investigations, actions, suits, proceedings and judgments relating to any of the foregoing.

The indemnifications by Berean and JFC also included an additional clause indemnifying

Jackson for damages arising out of "(d) the operation of [Berean/JFC, JFP, JMS or Jackson] at

any time before or after [the] Closing."[6]  Op. Agr., Art. IX, §§ 9.2, 9.3, 9.4.

### C.    Jackson Securities' June 7, 2005 News Release

On June 7, 2005, Jackson Securities issued a news release entitled "Jackson Securities

and Berean Capital merger forms stronger minority-owned investment bank."  The release stated

that Jackson had "merged" with Berean and that

> The merger will result in a powerful national presence through the alignment of the two firms' complementary business line strengths and expanded geographic coverage.  The merger sets a precedent for strategic consolidation amongst minority firms in the financial sector.  Through this merger, Jackson Securities and Berean Capital have demonstrated a long-term commitment to growing the expanded and consolidated Firm's capabilities to service and reach its growing client base throughout the United States.  Jackson Securities will announce the merger on Wednesday, June 8 . . . .

The press release continues to describe how McDaniel, Jackson's President/CEO, and Brown

---

[6]A "Guarantee" by McDaniel and the Estate of Maynard Jackson is also attached to the Transaction Agreement.  The provision, as well as Section 7.3 of the Transaction Agreement, guarantees JFC's payment of any liabilities resulting from the "Jackson consolidated group tax sharing policy and any tax sharing agreements among the members of the Jackson consolidated group."

"began talks of merging their firms at the 2004 NASP Conference" and quotes Brown:  "In

today's business environment, mergers have become a viable norm in the bulge bracket world of

finance . . . . Reuben and I asked, 'Why not in the minority and emerging firms space?'"  The

press release then quotes McDaniel: "We think there is value when minority firms can put the

egos aside to join forces to create a more powerful engine.  This merger represents a well

thought-out blend of synergies that will drive our presence on a national scale . . . ."  Jackson

asserts that Brown's statements in the news release were made for marketing purposes.

Brown also stated in a NASD "BrokerCheck" Report that "I have merged most of Berean

Capital into Jackson Securities."  Greystone discovered this by obtaining the report in 2007

during preparation for this trial.

### D.    Continued Existence of Berean as Brown's "$5,000 Broker/Dealer" Entity

Neither the Transaction Agreement nor the Operating Agreement provided for the

dissolution of Berean after the transaction.  On the contrary, the Operating Agreement contained

the following provision:

> Notwithstanding the foregoing, Brown may continue to hold an ownership interest
> in Berean Capital, Inc. ("Berean") and through Berean carry on such business
> activities as $5,000 broker/dealers are permitted to carry on, including, without
> limitation, performing private placements and acting as a conduit for certain other
> securities transactions.

Op. Agr. § 5.11(b).  Berean's securities license appears to be the only asset it retained after the

2005 transaction.[7]

_____

[7] The "$5,000 broker/dealer" provision refers to the limited authorization described in 17
C.F.R. § 240.15c3-1 for broker/dealers who maintain net capital of only $5,000.  Such "$5,000
broker/dealers" are extremely limited in their authorized activities.  They may not "receive,
directly or indirectly, or hold funds or securities for, or owe funds or securities to, customers and
does not carry accounts of, or for, customers," 17 C.F.R. § 240.15c3-1 (a)(2)(vi).  They may not

Brown stated in his deposition that "Berean Capital, we currently do some private equity business.  We work with one or two commodity accounts, and we also will do some – a little bit of hedge fund business." Brown Deposition at 9.  He also reported to FINRA, a securities market regulator, that Berean "is an investment related business which develops real estate. . . . and there is minimal operations.  I currently spend 1 hr a month on the business."  FINRA BrokerCheck Report for Dudley Brown, at 5.  He also stated in that report that "I have merged most of Berean Capital into Jackson Securities to draw from the business strengths of both firms. . . . Berean Capital now operates as a $5,000 broker/dealer with limited activities."  Id. at 11.  Berean's FINRA BrokerCheck Report (as of October 27, 2008) states that Berean conducts "private placements of securities."  Nonetheless, even after given the opportunity for supplemental briefing, Jackson has produced no evidence, apart from the unsubstantiated statements of Dudley Brown, that even "limited activities" were ever carried out subsequent to the merger.  There is no documentary evidence (such as internal records, tax returns, or customer lists) that Berean earned any income at all subsequent to the merger, or that Berean introduced even a single customer to

_____

engage in any of the typical activities of other broker/dealers, which are required to carry higher net capital balances in order to conduct those activities.  For example, they may not carry customer accounts or receive or hold funds or securities for those persons, including by receiving checks payable to itself from customers (for this, maintaining $250,000 in net capital is required). 17 C.F.R. § 240.15c3-1 (a)(2)(i).  A broker or dealer that introduces transactions and accounts of customers or other brokers or dealers to another registered broker or dealer that carries such accounts is required to maintain net capital of not less than $50,000.  17 C.F.R. § 240.15c3-1 (a)(2)(iv).

A $5,000 broker/dealer who engages in a customer's buy order must first "purchase[] as principal the same number of shares . . . necessary to complete the order, which shall be cleared through another registered broker or dealer."  240.15c3-1 (a)(2)(vi)(A).  Similarly, a $5,000 broker/dealer who engages in a sell order must first "sell[] as principal the same number of shares or a portion thereof, which shall be cleared through another registered broker or dealer." 240.15c3-1 (a)(2)(vi)(B).

any other brokerage firm.

**E.     Response to the 2005 Transaction**

In late summer of 2005, Greystone inquired of Berean's counsel as to the nature of the Berean/Jackson transaction. Greystone was advised by Berean's counsel that Brown represented that no material change to Berean occurred as a result of the transactions. Jackson did not inform Greystone of the merger in advance, and it did not provide Greystone with the Transaction Agreement until October 2008, after Greystone sought to amend the complaint in this action to include Jackson as an additional defendant [see Dkt. # 109, filed Aug. 7, 2007].

**F.     Cross Motions for Summary Judgment**

Both Greystone and Jackson have filed motions for summary judgment as to the issue of successor liability. Greystone argues that successor liability for Jackson is appropriate because (1) the 2005 transaction was a *de facto* merger, (2) the Transaction Agreement contained an express assumption of Berean's liabilities by Jackson, (3) Jackson is a "mere continuation" of Berean by virtue of the 2005 merger, (4) Berean received no consideration for the transaction, and (5) the transaction was a fraudulent conveyance. Greystone argues that the result is the same under the substantive law of Connecticut, Illinois, and Georgia. Jackson argues that the substantive law of Illinois or Georgia should apply because these states differ from Connecticut as to the factors required for a finding of successor liability by virtue of *de facto* merger, but that no successor liability should be found under any state's law. In the alternative, Jackson seeks severance of the claims against it into a separate trial.

**II.     Summary Judgment Standard**

In a summary judgment motion, the burden is on the moving party to establish that there

are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56;  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Eng'g Corp., 221 F.3d 293, 300 (2d Cir. 2000); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994)).  Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor.  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

        In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton, 202 F.3d at 134. Consistent with this standard, all evidence favorable to the nonmoving party must be credited if a reasonable jury could credit it.  Evidence favorable to the moving party, on the other hand, must be disregarded unless a reasonable jury would have to credit it because it comes from a disinterested source and is uncontradicted and unimpeached. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

III.    **Discussion**

A.    **Choice of Law**

In a diversity action such as this one,[8] a federal court must apply the choice of law rules of the forum state.  MM Global Svcs., Inc. v. Dow Chemical Co., 283 F.Supp.2d 689, 699 (D. Conn. 2003) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)); Peglar & Assocs., Inc. v. Prof. Indemnity Underwriters Corp., No. X05CV970160824S, 2002 Conn. Super. LEXIS 2103 at *8-9, 2002 WL 1610037 (Conn. Super. Ct. June 19, 2002).  In Connecticut, the Court must select the local law of the state having the "most significant relationship" to the occurrence and the parties to the dispute.  MM Global Svcs., 283 F.Supp.2d at 699 (citing Reichhold Chems., Inc. v. Hartford Accident & Indemnity Co., 243 Conn. 401, 408-14, 703 A.2d 1132 (1997)).  In applying the "most significant relationship" test to disputes involving contracts, the court examines (1) the place of contracting, which is the place of the last act necessary to give the contract binding effect; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.  Id. "These factors are to be evaluated according to their relative importance with respect to the particular issue, and if the place of negotiating the contract and the place of performance are the same, the local law of that state will usually be applied."  Peglar, 2002 Conn. Super. LEXIS 2103 at *9.

_____

[8]Greystone is a Connecticut corporation with principal place of business in Hartford, Connecticut.  Berean is an Illinois corporation with principal place of business in Chicago, Illinois.  Jackson Securities is a Georgia limited liability company with principal place of business in Atlanta, Georgia.

Connecticut has also adopted Section 187 of the Restatement (Second) of Conflict of Laws (1971), which provides that the law of the state chosen by the parties to govern their contractual rights and duties will be applied unless (1) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for their choice, or (2) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of the applicable law in the absence of an effective choice by the parties.  See, e.g., Elgar v. Elgar, 238 Conn. 839, 846, 850 and n.7, 679 A.2d 937, 941, 943 and n.7 (1996), Peglar, 2002 Conn. Super. LEXIS 2103 at *8-9.

The "particular issue" to be decided with respect to the instant motions for summary judgment is the liability of a succeeding business entity (Jackson Securities) following the alleged merger and consolidation with the original defendant (Berean) in this case.  Thus the contract(s) creating the alleged successor entity, not the conduct or contract(s) underlying the plaintiff's original claims against Berean, are at issue.  See, e.g., Webb v. Rodgers Machinery Mfg. Co., 750 F.2d 368, 374 (5th Cir. 1985); Ambrose v. Southworth Prods. Corp., 953 F. Supp. 728, 734 (W. D. Va. 1997); In re Asbestos Litig. (Bell), 517 A.2d 697, 698 (Del. Super. Ct. 1986).

The 2005 Transaction Agreement is the primary contract creating the alleged successor entity in this case.  The Transaction Agreement's choice of law provision states that Illinois law will apply, and Illinois is the primary location of two parties to the contract (Brown and Berean) as well as of half of the subject matter of the contract (Berean).  Illinois thus has a substantial relationship to the parties and the subject matter, and this Court begins its analysis with the

premise that the law of Illinois applies to the issue of successor liability.  However,

> [u]nder modern conflicts-of-law theory, where there is a 'false conflict' such that the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them.  In such a case, the case ought to be decided under the law that is common to both states.  It is only after a determination is made that there is indeed an actual conflict between the laws of the particular jurisdictions that the interests of the respective jurisdictions are analyzed.

Nat'l Council on Compensation Ins., Inc. v. Caro & Graifman, P.C., Civ. No. 3:00-CV-1925 (AHN), 2008 WL 450413 at *19-20 (D. Conn. Feb. 15, 2008) (quoting Haymond v. Statewide Grievance Comm., 45 Conn. Super. Ct. 481, 488-89 (1997), aff'd, 247 Conn. 436 (1998), citing Walzer v. Walzer, 173 Conn. 62, 76 (1977) ("When the applicable law of a foreign state is not shown to be otherwise, [Connecticut] presume[s] it to be the same as [its] own.")).

The laws of Connecticut and of Illinois on successor liability are not in conflict with respect to the general principles of successor liability and its exceptions, as discussed below. However, the laws of Connecticut and Illinois are in conflict with respect to the specific application of the four-factor test for determining whether a transaction falls under the *de facto* merger exception to the general rule of successor non-liability.  Accordingly, the Court considers the interests of both Connecticut and Illinois in order to determine which state's substantive law should apply to this question.  The Court finds that with respect to the particular issue to be determined in this ruling, which is the contract between Brown, Berean and Jackson, Illinois has the more significant relationship.  Illinois is Berean's principal place of business and Brown's state of domicile.  A significant portion of the subject matter of the contract was accordingly located in Illinois, as was a significant portion of the performance.  Illinois law was chosen by the parties to govern the Transaction Agreement, and it does have a substantial relationship to the

-12-

transaction and to at least one of the parties to the contract.  Finally, even though Connecticut has

an interest in protecting the rights of its citizens, including the plaintiff, Connecticut's interest in

the correct determination of whether successor liability should result from the 2005 transaction is

not "materially greater" than that of Illinois, nor is it clear that in the absence of an effective

choice of law by the parties, Connecticut law would apply.  Accordingly, neither the Restatement

test nor the "most significant relationship" test require the Court to apply Connecticut law rather

than Illinois law where, as here, the two states' substantive laws are in conflict.

The Court therefore applies the law of Illinois to determine whether the 2005 transaction

was a *de facto* merger.  As there is no conflict between Connecticut and Illinois law as to the

general rule of successor non-liability or its other exceptions, the Court applies Connecticut

substantive law (which is the same as applying substantive law common to both states) to these

additional questions.

### B.    Successor Liability

In Connecticut, as in Illinois and in most other jurisdictions, the general rule is that a

corporation that acquires the assets of another entity does not assume that entity's former

liabilities.  See, e.g., Collins v. Olin Corp., 434 F.Supp.2d 97, 102 (D. Conn. 2006) (citing 15

Fletcher Cyc. of Private Corps. § 7122); Steel Co. v. Morgan Marshall Inds., Inc., 662 N.E.2d

595, 599 (Ill. App. Ct. 1996) (citing Hernandez v. Johnson Press Corp., 388 N.E.2d 778 (Ill.

App. Ct. 1979)).  There are four exceptions to the general rule, which apply in most jurisdictions,

again including both Connecticut and Illinois:

(1) where there is an express or implied agreement of assumption;

(2) where the transaction amounts to a merger or consolidation of the two firms, or a "*de*

*facto* merger";

(3) where the purchaser is a "mere continuation" of the seller; or

(4) where the transaction is entered into fraudulently for the purpose of escaping liability for the seller's obligations.

Collins, 434 F.Supp.2d at 102 (citing Ricciardello v. J.W. Gant & Co., 717 F. Supp. 56, 58 (D. Conn. 1989)); Steel Co., 662 N.E.2d at 599 (citing Kaleta v. Whittaker Corp., 583 N.E.2d 567 (Ill. App. Ct. 1991); see also Baltimore Luggage Co. v. Holtman, 562 A.2d 1286, 1289-90 (Md. Ct. Spec. App. 1989) (citing Golden State Bottling Co. v. Nat'l Labor Relations Bd., 414 U.S. 168, 182-83 n.5 (1973), 15 Fletcher, Cyc. of Private Corps. § 7122 (rev. perm. ed. 1983), 19 Am.Jur.2d, Corporations §§ 2704-2722 (1986)).

### (1)      Express Assumption of Liabilities Exception to Non-Liability Rule

Greystone argues that the Transaction Agreement contained an express assumption of Berean's liabilities by Jackson, because the agreement expressly provided for the assumption of Berean's "current liabilities" not to exceed $75,000 and because of the Transaction Agreement's indemnification clauses.  However, these arguments misconstrue the clear import of these rather unremarkable contractual provisions.  "Current liabilities" is an accounting term with a specific meaning (debts coming due within one year, typically normal operating liabilities and a portion of long-term debt).  The post-consolidation Jackson Securities did not expressly assume *all* of Berean's liabilities - only those necessary for Berean to continue operating on a day-to-day basis.  The indemnification clauses in the contract also do not expressly assume all liabilities - only those resulting from inaccuracies or breaches of contract relating to the Transaction Agreement itself.  These provisions, by which Brown, Berean, and Jackson Financial Corporation *each*

-14-

indemnified Jackson Securities for any of their own breaches, do not constitute an express or

implied assumption of *all* Berean's liability by Jackson Securities, as Greystone seems to argue.

### (2)    *De Facto* Merger Exception to Non-Liability Rule

A "de facto merger occurs when a transaction, although not in form a merger, is in

substance 'a consolidation or merger of seller and purchaser.'"  New York v. Nat'l Svc. Inds.,

Inc., 460 F.3d 201, 209 (2d Cir. 2006) (citing Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41,

45 (2d Cir. 2003)).  Four factors are used to determine whether a *de facto* merger has occurred:

> (1) continuation of the enterprise of the seller corporation so that there is a continuity of
> management, personnel, physical location, assets and general business operations; (2)
> continuity of shareholders; (3) the seller corporation ceases its ordinary business
> operations, liquidates, and dissolves as soon as legally and practically possible; (4) the
> purchasing corporation assumes those liabilities and obligations of the seller ordinarily
> necessary for the uninterrupted continuation of normal business operations of the seller
> corporation.

Collins, 434 F.Supp.2d at 103 (citing Peglar, 2002 WL 1610037 at  at *7).

Under Connecticut law, "not every one of these indicia must be established, but the court

should apply more of a balancing test."  Id. (quoting Peglar at *7).  "Analysis of the necessary

factors should be undertaken in a flexible, realistic manner, focusing on intent."  Id. (quoting

Savings Bank of Manchester v. Daly, No. CV020813164S, 2004 WL 3130581 at *3 (Conn.

Super. Ct. Dec. 23, 2004)).  See also New York v. Nat'l Svc. Inds., Inc., 460 F.3d at 209 ("At

common law, the hallmarks of a de facto merger include (1) continuity of ownership; (2)

cessation of ordinary business and dissolution of the acquired corporation as soon as possible; (3)

assumption by the purchaser of the liabilities ordinarily necessary for the uninterrupted

continuation of the business of the acquired corporation; and (4) continuity of management,

personnel, physical location, assets, and general business operation." (emphasis added)).

-15-

Illinois courts generally require the same four factors as those cited by Connecticut courts.  See, e.g., Steel Co., 662 N.E.2d at 600 (citing Nguyen v. Johnson Machine & Press Corp., 433 N.E.2d 1104 (Ill. App. Ct. 1982)).  However, Illinois courts generally seem to require that all four factors are present, rather than applying the balancing test used in Connecticut.  See, e.g., Brandon v. St. Clair Anesthesia, Ltd., No. 03-CV-0493-MJR, 2004 WL 3334292 at *6 (S.D. Ill. Nov. 24, 2004); Gray v. Mundelein Coll., 695 N.E.2d 1379 (Ill. App. Ct. 1998); Myers v. Putzmeister, Inc., 596 N.E.2d 754 (Ill. App. Ct. 1992); Kramer v. Weedhopper of Utah, Inc., 562 N.E.2d 271, 275 (Ill. App. Ct. 1990).  Not all the Illinois cases discussing the four *de facto* merger factors explicitly require that all four be present, including Hernandez v. Johnson Press Corp., 388 N.E.2d 778 (Ill. App. Ct. 1979), a case which is nevertheless often cited for that proposition.  See, e.g., Green v. Firestone Tire & Rubber Co., 460 N.E.2d 895, 899-900 (Ill. App. Ct. 1984) (explicitly requiring only continuity of ownership).  Moreover, the Illinois Appellate Court has stated that because "*de facto* merger is a judicially created equity principle for the purpose of avoiding injustices," the "application of the *de facto* merger principle must . . . be liberally construed in favor of allowing a remedy for a wrongfully caused injury."  Fenderson v. Athey Prods. Corp., Kolman Div., 581 N.E.2d 288, 291-92 (Ill. App. Ct. 1991) (rejecting defendant's contention that stock of the acquiring company must be the primary consideration of the transaction to satisfy *de facto* merger's third criterion, and finding continuity of ownership based on transfer of over $400,000 of defendant's stock and an $850,000 long-term corporate note).  Still, it is clear that the laws of Illinois and of Connecticut are in some conflict with respect to the *de facto* merger test, and this Court accordingly applies the law of Illinois to this issue.  Under Illinois law, which requires that all four factors be satisfied, but which also liberally

-16-

construes those factors in favor of allowing a remedy for unjustly caused injury, the Court finds

that genuine issues of material fact remain at least as to whether Berean effectively "cease[d] its

ordinary business operations, liquidate[d], and dissolve[d] as soon as legally and practically

possible" after the 2005 merger.

### (3)     "Mere Continuation" Exception to Non-Liability Rule

In Connecticut, analysis of a "mere continuation" and a "*de facto* merger" may be treated

together as part of the weighing of the same four *de facto* merger factors described above.

Collins, 434 F.Supp.2d at 103 (citing Peglar, 2002 WL 1610037 at *6-7).  However, some

Connecticut courts have treated the two exceptions separately, and have described two theories

used to determine whether a purchaser is merely a continuation of the selling corporation: the

"mere continuation" theory and the "continuity of enterprise" theory.  "Under the common law

mere continuation theory, successor liability attaches when the plaintiff demonstrates the

existence of a single corporation after the transfer of assets, with an identity of stock,

stockholders, and directors between the successor and predecessor corporations."  Chamlink

Corp. v. Merritt Extruder Corp., 96 Conn.App. 183, 188, 899 A.2d 90, 93 (2006) (quoting

Graham v. James, 144 F.3d 229, 240 (2d Cir. 1998)).  "Under the 'continuity of enterprise'

theory, a mere continuation exists 'if the successor maintains the same business, with the same

employees doing the same jobs, under the same supervisors, working conditions, and production

processes, and produces the same products for the same customers.'"  Id. (quoting B.F. Goodrich

v. Betkoski, 99 F.3d 505, 519 (2d Cir. 1996)).

Under Illinois law, the "continuation" exception to the rule of successor nonliability

applies when the purchasing corporation is "merely a continuation or reincarnation of the selling

-17-

corporation" – in other words, it maintains the same or similar management and ownership, but merely "wears different clothes." <u>Vernon v. Schuster</u>, 688 N.E.2d 1172, 1176 (Ill. 1997) (quoting <u>Bud Antle, Inc. v. Eastern Foods, Inc.</u>, 758 F.2d 1451, 1458 (11th Cir. 1985)).  Because the Illinois test for the continuation exception is "whether there is a continuation of the *corporate entity of the seller* - not whether there is a continuation of the *seller's business operation*, . . . . the majority of courts considering this exception emphasize a common identity of officers, directors, and stock between the selling and purchasing corporation as the key element of a 'continuation.'" <u>Id.</u> (quoting <u>Tucker v. Paxson Machine Co.</u>, 645 F.2d 620, 625-6 (8th Cir. 1981)).

Thus the test for the "mere continuation" exception in Connecticut and in Illinois is materially the same, and in both states a "mere continuation" analysis is similar to and overlaps with the *de facto* merger analysis.  Like Connecticut courts, some Illinois courts have considered the *de facto* merger and the "continuation" exceptions together, and other Illinois courts have treated the two exceptions separately, for example finding that a continuity of ownership (shareholders) between the seller and purchaser entities can alone support application of the "continuation" exception while simultaneously finding that questions of fact exist as to the *de facto* merger exception.  <u>Steel Co.</u>, 662 N.E.2d at 600.  <u>See also</u> <u>Park v. Townson & Alexander, Inc.</u>, 679 N.E.2d 107 (Ill. App. Ct. 1997) (finding "mere continuation" without considering *de facto* merger).

The Court finds that the same questions of material fact that preclude summary judgment as to the *de facto* merger inquiry also preclude summary judgment on the mere continuation inquiry.

**(4)     Fraud Exception to Non-Liability Rule**

The fourth exception to successor non-liability, which applies to fraudulent transactions,

imposes liability where a sale or merger is entered into for the fraudulent purpose of escaping

liability for the seller/debtor's obligations.  Collins, 434 F.Supp.2d at 102; Steel Co., 662 N.E.2d

at 599.  Connecticut law and Illinois law use somewhat different terminology with respect to the

fraud exception, but are not materially different in content.

By statute, both Connecticut and Illinois law provide that any conveyance or assignment

of real or personal property made with the intent to disturb, delay, hinder or defraud creditors is

void as against such creditors.  Conn. Gen. Stat. § 52-552e; Ill.Rev.Stat.1975, ch. 59, par. 4.

Illinois recognizes two general types of fraudulent conveyances: "Fraud in Law," which occurs

when there is no consideration or inadequate consideration for a transfer which directly impairs

or tends to impair the rights of creditors.  Casey Nat. Bank v. Roan, 668 N.E.2d 608, 611

(Ill.App.Ct. 1996).  "Fraud in Fact" occurs where consideration is given but an actual intent to

hinder or defraud creditors exists.  Id.; see also Tri-Star Cabinet & Top Co., Inc. v. Heatherwood

Homes, Inc., 354 N.E.2d 4, 6 (Ill.App.Ct. 1976); Stopka v. Commercial Embroidery, Inc., 428

N.E.2d 1130, 1132 (Ill.App.Ct. 1981).  "Fraud is presumed, without showing a specific

fraudulent interest, in those cases involving 'fraud in law.' "  Second Nat. Bank of Robinson v.

Jones, 33 N.E.2d 732, 736 (Ill.App.Ct. 1941); Casey Nat. Bank, 668 N.E.2d at 611.  Fraud in law

instead requires proof of (1) a voluntary transfer for inadequate consideration, (2) an existing

indebtedness against the donor, and (3) retention by the donor of insufficient property to satisfy

the indebtedness.  Casey Nat. Bank, 668 N.E.2d at 611.

As to "fraud in fact," Illinois courts look to the Uniform Fraudulent Transfer Act (UFTA)

and associated case law for guidance in determining whether a conveyance was made "with

actual intent to hinder, delay or defraud any creditor."  Brandon, 2004 WL 3334292 at *8 (citing

Davila v. Magna Holding Co., 2000 WL 263690 at *9 (N. D. Ill. 2000)).  A creditor can prove

actual intent to hinder, delay or defraud based on the existence of certain "badges of fraud"

enumerated in the UFTA.  Id. at *9 (citing Lindholm v. Holtz, 581 N.E.2d 860 (Ill. App. Ct.

1991)).  These include whether:

    (1)    the transfer or obligation was made to an insider;

    (2)    the debtor retained possession or control of the property transferred after the transfer;

    (3)    the transfer or obligation was disclosed or concealed;

    (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    (5)    the transfer was of substantially all the debtor's assets;

    (6)    the debtor absconded;

    (7)    the debtor removed or concealed assets;

    (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred;

    (11)    the debtor transferred the essential assets of the business to a lienor who

transferred the assets to an insider of the debtor.

<u>Brandon</u>, 2004 WL 3334292 at *9 (citing 740 Ill. Comp. Stat. 160/5(b)(1)-(11)).  When these badges of fraud are present in sufficient number, it may give rise to an inference or presumption of fraud.  <u>Id.</u> (citing <u>Kaibab Indus., Inc. v. Family Ready Homes, Inc.</u>, 372 N.E.2d 139, 143 (Ill. App. Ct. 1978)).

Connecticut has also adopted the UFTA factors for determining whether fraudulent intent is present.  <u>See, e.g.</u>, <u>Breen v. Judge</u>, No. No. CV074033896, 2009 WL 1175543 at *3 n.1 (Conn. Super. Ct. Apr. 2, 2009) (quoting Conn. Gen. Stat. § 52-552e(b), which lists the UFTA factors). However, recent Connecticut cases do not cite the "fraud in law" / "fraud in fact" distinction by that name.  Conn. Gen. Stat. § 52-552e (a) instead provides in relevant part: "A transfer made ... by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation . . . ." <u>Id.</u>  Connecticut's Supreme Court has stated that "In the area of fraudulent conveyances . . . [t]he party seeking to set aside a conveyance as fraudulent bears the burden of proving either: (1) that the conveyance was made without substantial consideration and rendered the transferor unable to meet his obligations; or (2) that the conveyance was made with a fraudulent intent in which the grantee participated."  <u>Wendell Corp. Trustee v. Thurston</u>, 680 A .2d 1314, 1318 (Conn. 1996) (Emphasis in original; internal quotation marks omitted).  Thus, materially the same analysis regarding the two types of fraudulent conveyance must be conducted under the law of either state.

The Court finds that in light of these standards, genuine issues of material fact remain at least as to whether the 2005 merger transaction was either "fraud in law" or "fraud in fact."  For example, there are factual issues as to the value of the consideration, if any, that Berean (not Brown) received in return for the conveyance of its assets to Jackson; as to the possibility of fraudulent intent as to the 2005 merger; as to the amount of indebtedness, if any, owed to Greystone by virtue of this, then-existing lawsuit; and as to whether Berean's retained property after the merger was sufficient to satisfy that indebtedness.

### (3)    Conclusion: Successor Liability

As several material questions of fact remain, neither movant has shown that it is entitled to summary judgment on the issue of successor liability, whether under the *de facto* merger, the "mere continuation" theory, or the fraud exceptions to the general rule of non-liability. Accordingly, both motions for summary judgment are denied.

### C.    Motion for Severance

Under Rule 21, "[a]ny claim against a party may be severed and proceeded with separately," even though a party may initially combine all of its claims against a particular defendant. Preferred Medical, P.C. v. Geico General Ins. Co., No. 03 civ. 8516 (DCF), 2005 WL 2777309, at *3 (S.D.N.Y. 2005) (citing Fed.R.Civ.P. 21). Nonetheless, "[t]he decision whether to grant a severance motion is committed to the sound discretion of the trial court." Id. (quoting In re Ski Train Fire, 224 F.R.D. 543, 546 (S.D.N.Y. 2004)).  Because "considerations of convenience, avoidance of prejudice to the parties, and efficiency" are implicated, courts weigh several factors in a severance analysis, including: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact;

(3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." Id. (quoting Deajess Med. Imaging, P.C. ex rel. Barry v. Geico Gen. Ins. Co., No. 03 Civ. 7388 (DCF), 2005 WL 823884, at *2 (S.D.N.Y. Apr. 7, 2005)).

Jackson's motion for severance of the successor liability into separate trials is denied, as (1) claims of fraud in the Fourth Amended Complaint against both Berean and Jackson arise out of the same 2005 transaction; (2) these claims present common questions of law and fact; (2) two trials would prejudice Greystone and cause both Greystone and the Court unnecessary additional time and expense and would not facilitate judicial economy.

IV.    **Conclusion**

For the foregoing reasons, the Motions for Summary Judgment and the Motion for Severance [Dkt. # 153, 154] are DENIED.

Also pending are three motions by Jackson for a protective order and stay of discovery [Dkt. # 176, 178, and 191].  Those motions are denied as moot in light of this ruling.

So ordered this 29th day of July, 2009 at Hartford, Connecticut.

/s/ Christopher F. Droney
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**

-23-